Good afternoon. Good afternoon. Excuse me. You're making mistakes already. I haven't even started yet. Intimidated my colleagues. So, what we thought we'd do, Mr. Romano, Mr. Wallman, Ms. Arkel, is it Arkel? Arkel? I think it probably makes sense for Mr. Romano to address both cases, and then we'll hear from Defense Counsel and then we'll hear the rebuttal. So does that work for you, sir? It does, Your Honor. All right. Whenever you're ready. May it please the Court, John Romano for the United States, I'd like to reserve five minutes for rebuttal. Sure. Thank you. As your honors are aware, this is the third government appeal in this case. In the previous two, this Court has found significant procedural errors. Unfortunately, at the third sentencing, the District Court committed yet more serious errors. Unlike Judge McKee on this panel, I don't have experience with the prior two iterations of the matter. So just so I am clear, am I correctly looking at two mandates from Jackson 2 that are at issue here? That is, first, to consider the injuries holistically rather than individually, and second, to apply the aggravated assault guideline to counts in addition to count 10. Is that what is at stake here? Yes. I think that's at the micro level, that's what's at stake here. I'm always at the micro level. When you're 5'8", there's only one way of looking at it. Right. True. I would say, Your Honor, at the macro level, if you like, we're asking for reassignment in this case because I think you could actually draw a line from the first sentencing through the third sentencing and see a consistent theme here and a consistent series of errors. Jackson 1 said, and this is a quote, refusing to find aggravating facts under the applicable preponderance standard, it, the District Court, repeatedly indicated that it would not make any factual findings that were not necessarily found by the jury or shown beyond reasonable doubt. Fast forward to the second sentencing. The District Court applied the aggravated assault guideline to just one group, one count, count 10. That was C's hypernatremia. And why did the court do that? The court said, the language of the charge and the juries having convicted on that charge, close quote, compels that finding. The court then said, I don't need to worry about whether the government has properly instructed the jury. The court didn't find any other injuries or aggravated assaults, refused to make those findings unless they were compelled by the jury. So arguably, the court violated the mandate in Jackson 1 right there. Let's move to the third sentencing. Kennedy, he had a different view of the law, quite clearly. Yeah. And, Your Honor, and throughout, through all three, the court has said, despite what this Court has said, doesn't want to make findings by a preponderance of the evidence. Doesn't think it's fair. Thinks it's unconstitutional. Thinks that the government has done something wrong. The government has done nothing wrong here in charging this case. But I move ahead to the third sentencing, the one that's at issue here. This is on page 9021. The court said it would not, quote, fill in, unquote, holes by preponderance, quote, particularly where the government has crafted the charge and has here argued successfully that the degree of harm need not be presented to the jury. This is on page 9042. The court said that the harm caused by the hot sauce on toddlers, toddlers and babies, quote, is what the government chose not to ask for a jury to wrestle with. 9043, the court said that the jury could have, quote, been instructed on proof beyond a reasonable doubt, close quote. And that the defense, quote, would demand that the jury hold the government to its burden of proof beyond a reasonable doubt or acquit. In other words, the court is refusing to find facts that aren't compelled by the jury's verdict in this case. What should the court do? Let's assume we send it back. What should the court do? Should the court take each of the counsel conviction and apply the aggravated assault guidelines to each of the counsel convictions, assuming the court finds by a preponderance of the evidence the evidence satisfied it? Yes, Your Honor. And the commission counts. So we separated the counts between omission counts. Those were the neglect counts. And the government has all along said aggravated assault guideline won't apply to those because there's no sufficiently analogous guideline. That was the issue in Jackson 1. For the other counts, the government believes that the aggravated assault guidelines should apply to all. Counts specifically there. So those are groups, they're groups 1 through 5 and the counts are, let's see if I can find that. For Joshua, it would be counts 1 through 3. Group 2 for C is counts 1 and 12. Group 3 for C is groups 9 and 10. And the court has already found the aggravated assault guidelines to those. Group 4 for J is counts 1 and 6. And group 5 for J is count 5. And Your Honor, I'm going back to what Judge Smith asked, the initial question. I think you could just, I mean, I think that you're going to hear a lot in this case. There's a lot of stuff floating around. There's a lot, there's a big becker here. I think all this court needs to do is look at, let's see if I can find this. Page 100. Excuse me. Page 100, what are you looking for? Page 100 of Jackson 2 lays out the analysis. It says, consider these injuries not in isolation but together with the jury verdicts. It then sets forth the jury verdicts and then it has a very nice paragraph about what to do. Consider these things all together. And I can go through the analysis, but all I need you to do then is look at page 9040 of the appendix. That's where the court goes through the, that's where the court analyzes group 2, which is the marks, the scars on C, including the humorous structure. And what does the court say? Court says, well, the defense sentencing experts are really well credentialed. They said it was eczema, so it's eczema. That's what the court said. That was the court's entire analysis on that count. Did the court consider the jury verdicts, that the jury had found beyond a reasonable doubt that C had been physically assaulted by objects and implements or by hands? No. And she concluded the fracture as being eczema? The fracture, she said, wasn't caused by the Jacksons. Now, what's the evidence of that? I'll just, quick detour. There was one, I don't even think it was a witness. It was one doctor who looked at one x-ray and said, well, I think that injury could have happened anywhere between birth and two years. Two years is when she left their custody. She was out of their custody between birth and two months. So in other words, it might have happened in that little time frame, but it could have happened in this entire period. Mr. Romano, I hate to sound ignorant about this, but I will admit it. What is the doctrine of chances? I have not seen that invoked before. I've been around a long time. I'm well familiar with probability theory. What is it, and how, if at all, does it enter into what you're just describing? That is the need to look, our directive, to look at the children's injuries collectively. I think it's just sort of a fancy way of saying what we all know, which is you gotta put sort of everything together to really understand what's going on. I think both sides have used the term at some point. I know it's in the Appellee's brief this time around, but the government may have even used it in the past. It came from a Seventh Circuit case, Your Honor, and I don't remember the case name. But the idea was, and I think it's applicable here, I raised it at the second sentencing hearing. If a man wins the lottery once, he's congratulated. If he wins it twice, you start to wonder. Here, you put everything together, and I think this court has an almost identical doctrine in the child abuse case itself, ADAN, and that's in our brief. Where the judge said, well, I can explain that, and I can explain that, and I can explain that, but when you look at the whole thing, you say, well, really, can we really find innocent explanations for every single one of these things when we know the constellation of what's going on? And I- If a mathematician could probably come up with an actual probability for an event given certain number of factors that are presented to her, it sounds like this is sort of a crude way of referring to the probability of an event occurring or not occurring. Yeah, I think that's fair, Your Honor. And I think if you look at, and again, a little off track here, but if you look at everything that the court should have considered here, let me run through that analysis just on count 12. Because when I say it out loud, you realize how extreme this is. The district court could have, let's say, and I'll agree, could have looked at the defendant's sentencing experts. Though, as we say, and I think even the defendant agrees, and I just want to put a page number on the record, 7389, that's where the defendant agrees that those doctors looked at everything in isolation. So they agreed with the government about that. Defendant thinks that's the right way to do it. This was before Jackson 2. Okay, district court could look at that and say, okay, these are experts. They said it's from eczema. Great, what else should the court have looked at? Well, the jury found beyond a reasonable doubt that C was abused with hands and objects. The jury found that C was starved, food was withheld from her, water was withheld from her, medical treatment was withheld from her. We know that C, when she went to the hospital with hyponatremia, that the doctor, this is just happenstance, the doctor had also treated Joshua. And he said, this is page 222 of the record, he had only one other child came to mind, Joshua. Counsel, I think maybe it came from you or from your office that we'd be referring to the children involved here, the young people involved here by name. Now, Joshua, I think you had indicated we could refer to by name. Yes. I just wanted to make sure we were on the same page there. Yes, so Joshua looked, it's the only child that the doctor even remembered. But of all the kids he had seen, that's the one that came to mind. Well, what do we know about Joshua? Joshua, the jury found, was physically assaulted with hands and objects. Same thing. Joshua had, I don't even know, nine different injuries. What else do we know? We know that the treating physician, or the treating doctors, who actually saw C, said these marks weren't eczema, most of them. We have the treating physician wrote a sentencing letter, said I think that they were from implements. I think they were, I'm sorry. From implements, from being hit. We have C left the defendant's custody, hasn't had those issues anymore. We have evidence that Carolyn lied about where they came from, said that the birth mother caused them. You put all of these things together, and you say, and I just want to close here, I know my time is up, but note eight of Jackson two. It defies common sense to think that the jury found all of those things happened, but that they didn't cause these injuries. Question for you, I found it very unusual in the pre-sentence reports, that there was language in the pre-sentence reports that read along the lines of we haven't calculated the guideline range because you've asked us not to. What's the story there? The story there, your honor, is that during the first sentencing hearing, the district court found that the government had submitted proposed language for the narrative in the pre-sentence report. Is that unusual? That's not unusual in our, we said that's what we always do. I spent 14 years on the district court working with pre-sentence reports and probation officers, and what I knew about the process, at least from afar, that I didn't think that that was an unusual experience. We did not think that was unusual, your honor. The district court decided that was not happy with that. Struck, you will notice if you look at the PSR, there's no facts at all. Struck the entire factual record basically from the PSR, and then ask probation not to do any analysis. So for Jackson 2 and Jackson 3, there is no probation analysis. It comes solely from the parties. To your earlier point, I think that may be what my colleague was getting at. The probation officer was instructed not to do a guidelines calculation. That's right. So the PSR has no guidelines calculation. It comes solely from the government and from defense counsel. And to quote my literary colleague, a perforated, do you know what's up with that? Perforated? Do you know what's up with that? I'm quoting, kind of, quasi-quoting Judge Estrepo here. How did that come about? The court is striking probation not to do a guidelines calculation. That happened at the, following the first sentencing, the court struck that. And then going into the second sentencing, said that she wanted probation simply to update the PSR with what the defendant and the victims had been up to, but not to do an analysis. So tell us the other part of your argument, we'll give you time here. Let's assume we do remand it, where do we go? Does it go back to the same judge, and if so, why, if so, why not? Your Honor, we would ask that you reassign this case. It's been seven years to the day from the first sentencing hearing. Is that right? Seven years to the day. It's nearly six years since I argued the first appeal in this court. Judge Hayden explicitly acknowledged that if this case goes back, it ain't going to her, right? She did. She did. And I acknowledge, I've known Judge Hayden for a long time and have great respect for her as a trial court judge, as a district judge. I wonder if not only was this an acknowledgment, maybe it was a tacit expression of hope that if it came back, it didn't go back to her. I know that you're not in a position to answer that one way or another, but it did cross my mind. Well, Your Honor, what I would say is I think everyone, the district court, this court, the government, the defendant, the victims, the children, would like to see this case come to a close at some point. And I anticipated maybe questions about why we're still here. And the reason we're still here is because- I didn't know why we're still here. This is very serious. These were little innocent kids who are still really dealing with this. And we would like just a shake, a fair shake, at a sentencing before a judge with no procedural errors, and hopefully come up with a sentence that is more appropriate than the ones we've received. Well, and even beyond your preference, Mr. Romano, and completely irrespective of how any of us feel about our colleague, the district judge here, there may also be an appearance issue at this point in time as well that we need to take into account. Would you agree? I do, Your Honor. I have nothing else to add. Thank you. Thank you very much. Mr. Waldman, can you hear us all right, sir? I can. Good afternoon. Can you hear me? We hear you. We hear you and we see you. Good afternoon. Great. Great, thank you. Good afternoon to you. Herbert Waldman, Chevron-bound War Gap for Carroll and Jackson. Your Honors, one of the things that Mr. Romano said that I think was most incorrect is that Judge Hayden didn't find the facts. She refused to find the facts. She found the facts. She just didn't find them the way the government claims that they were. She also claimed that the doctors, the defense doctors, looked at the injuries in isolation. On page 11 of our brief, we quote Dr. Christian, who Judge Hayden considered to be a tremendous expert, and I think her CV backs that up. She said that she's diagnosed thousands of children with abusive injuries over the course of her career, and was keenly aware of considering injuries to multiple organ systems. However, in this case, while the children were maltreated, she found that many of the injuries are not the result of abuse. So A, Judge Hayden found the facts. She based it on doctors who she found far more credible than the experts that were presented by the government. And she looked at the, she almost anticipated this doctor of chances argument. She said she could look at the, you have to look at the injuries together, holistically, as we said earlier today. But that in this particular case, there were unique injuries that were not caused by abuse. When she looked at them, wasn't her finding at the beyond reasonable doubt level, that was the reason I dissented, in fact, in the first case. I thought that she sentenced based upon the facts which she found, and injuries she found, but that she, I didn't say this then, it's clear from our cases that Jackson 1 and Jackson 2. She was using a beyond reasonable doubt standard, rather than a preponderance of the evidence standard, and we told her in Jackson 2 to use a preponderance of the evidence standard. Well, the first time around, she didn't find the facts at all. She was concerned, a concern that we share, and a concern that lingers with her, that there were constitutional issues lurking when, in this case, when the jury doesn't find facts. However- That's exactly what I'm talking about. She expressly said, I'm putting that aside, and I'm looking at the facts by a preponderance of the evidence. So the direct answer to your question, Your Honor, is no. She did not use the beyond a reasonable doubt standard in her fact finding. She expressly said that she's using the standards that were directed by this court. Mr. Waldman, you've pointed out where you believe that Mr. Romano is wrong in saying she didn't find facts, that indeed, she did find facts. But of course, what we're here for, largely, is to determine whether or not there was a mandate in Jackson 2, and I'm not sure, in fact, I'm far from sure, that the district court has made findings for the aggravated assault guideline by looking at each injury in the context of all the other injuries that were reported, together with what would have been the jury's findings. I acknowledge that the district court acknowledged what the instruction was, and she did this in her oral opinion. But as you read through the record, it seemed to me that all she did was track through each injury independently, and then explain why each individual injury was more likely attributed to some by the Jacksons. And if I'm correct that that's what she did, then isn't that patently contrary to what was the mandate of Jackson 2? No, I don't think that's what she did at all, Your Honor. Matter of fact, I think she did the opposite. She had to make findings as to whether each individual group was elevated to an aggravated assault. And what she said at the outset of the sentencing was, I don't really have to revisit each and every injury. As a matter of fact, she felt she was being encryptized for doing it that way, injury by injury. She was doing it by the group. So for example, in the sentencing immediately preceding this one, group one was not treated as an aggravated assault. And these are injuries to, I'm not sure if I should use his name, Jay, with child Jay. And that included a group of injuries, a humerus injury, a finger injury, a bile duct injury, a head injury. And it didn't matter for guideline calculation purposes whether she attributed one or all of those injuries to assaultive behavior by the defendants. The result was exactly the same. So rather than going injury by injury, she said, okay, group one, I've been told that aggravated assault should apply to more than group three, count ten, and she did. She said, okay, I'm counting group one, the injury to Jay as an aggravated assault based upon the injury that he sustained to his finger. And that's sufficient for guideline purposes. Doesn't matter whether the other ones were or weren't, and she didn't go there. And she intentionally didn't go there. But Jackson 2 very specifically says, and I'm reading from Judge Ross' opinion. We have concluded that the government adequately proved that several of the children's serious injuries were in fact caused by the Jacksons. Thus were left the definite and firm conviction that a mistake was committed when the district court failed to apply the aggravated assault guideline to counts other than ten. So how do you reconcile your argument with Judge Ross' language with several? Well, she found that there was no question that the hyperdysphemia, two incidents were caused by defendant based on the jury verdict. She found that the finger injury was caused by defendant and applied that to aggravated assault to that group of injuries. She found that the humerus injury was caused by the defendant. Now, if we're going to say that there are more injuries, if the government's going to claim or if the court's going to decide that more injuries were caused by the defendants, I think someone ought to say, what were those injuries? And Mr. Romano- Well, didn't we lay that out though? And that's what I quoted to or cited Mr. Romano to page 100 of Jackson 2. The children, quoting from the opinion, The children suffered at least ten unusual and serious injuries while in Jackson's custody. For example, Joshua suffered, among other things, a fractured bowel duct, brain injury, fractured skull, fractured humerus, fractured spine, gangrenous finger. As another example, C suffered, among other injuries, a fractured humerus, two bouts of acute hyperdysphemia. The serious injuries, each of which involved the protracted impairment of the bottom defunction or required hospitalization, should not be viewed in isolation, but rather must be viewed together with the jury findings that the Jacksons were both guilty beyond a reasonable doubt. And that we laid out what the injuries were, we identified them, made it easy. We know what the injuries are. The question is, were they caused by the Jacksons? Your Honor, in the first Jackson opinion said there was going to be a battle over causation. And I was, you got one vote here. That's not the law of this case. And in the last sentence here, we laid out the fact that these injuries were established. Oh, I have no question. I'll give you two easy examples from my perspective. The bowel duct injury was one that Your Honor just read. Now, the physician who operated on Joshua opened his abdomen, fixed the bowel duct, saw the organ, and his testimony was that there's no way this could have been from assaultive conduct. Because if it had been, organs in between the bowel duct and his skin would have shown signs of injury. Now, I mean, I don't think, I don't consider it the law of the case that the bowel duct injury was caused by assaultive conduct. To me, that proposition has zero basis in reality and facts. I mean, the other example I would point to is the one that Mr. Romano used today and used in his sentencing. And it's on page 9011. And I'll just read it, it's very short. It says, the idea that C had a humerus fracture in zero to two months before she reached the Jacksons, but that Joshua had the same unusual humerus fracture and that both the defendants were convicted of assaulting the kids for years, but that C's humerus fracture is unrelated, again, defies common sense. Now, I understand the argument, but you have to, I think, consider at the same time that doctors, the doctor, we didn't get the doctor. The Child Welfare Agency in New Jersey sent the X-ray of C's humerus to a doctor in Maryland who said that it could have been a childbirth injury. The government says, and Mr. Romano says, we dispute that this was a painful, obvious injury that C had and that it should have been seen by people. It's people who have noticed that. So, the C put that time in when he said that injury took place. And the timing was at a time just after Mr. Jackson returned from Iraq. And at that time, Dr. Smith said, Chaya had an injured humerus, that's how he dated the injury. And so we had testimony from the woman who cared for Chaya when the Jacksons went away for a short vacation after Mr. Jackson's return, who said there was no injury. We had pictures that Judge Hayden referred to of Chaya raising her arm at a time when she supposedly couldn't. So, at trial, Dr. Smith changed his dating. The injury was now at an earlier date. But that injury couldn't have been at the earlier date because she was in a hospital in Indiana part of that time. And after the hospital, she was back in New Jersey and she was examined a couple of times by her pediatrician and there's no mention of the injury. So, on the one hand, you could have this common sense argument, but it's belied by the facts and the record. Counsel, what do you make of the questions we had from Mr. Romano about the pre-sentence report, the lack of guidelines calculations, an instruction from the district court not to go there? I think my recollection, and this was many years ago, um, Judge Hayden was very unhappy with the pre-sentence report because it purportedly listed facts which were all just the government's contentions. And the probation department made no effort to independently find facts where they were in dispute. And I don't think, I think it was frankly beyond their ability to do that. What do you mean independently find facts in that the pre-sentence report was being done after a jury determination where presumably facts had been found by the jury? Well, you know, it depends on what the facts were found by the jury. The pre-sentence report contended that the defendants were responsible for a lot of the injuries which were number one, contested, and number two, not found by the jury. And if I could respond to that briefly, let's remember that the jury verdict on Joshua. Well, let me back up. The serious injuries that Judge McKee mentioned before that Joshua had all occurred in Oklahoma. None of them occurred in New Jersey. The jury was instructed on count three, that was, that covered injuries that happened to Joshua in New Jersey. So the jury verdict didn't find any of those injuries happened at all, much less were attributed to the defendant. So, you know, and count one, which was this conspiracy count that gave the entire menu of injuries, the jury didn't have to find that any or all of those injuries took place at all. So I think that as the government has done consistently, they're over reading what the jury found because the jury wasn't asked to find a lot of these facts. And I think so, to get back to your original question, the original PSR had all these facts finding about these injuries, which were in dispute. So I think Judge Hayden said it's really beyond the ability of the probation department to resolve these disputes. They don't have the expertise or the experience to decide what, how these injuries were caused or who caused them. And until you decide the causation of these injuries, you really can't do a guideline analysis. You can't do a scoring. I don't know. Thank you very much. Thank you. Thank you. Do I have to, I sort of lost track of my time. Are you indicating that it's over, Your Honor? That's what I'm indicating, yeah. They wouldn't say it's over, but you're out of time. Thank you. Thank you. May it please the Court, Louise Arkell from the Office of the Federal Public Defender for Mr. John Jackson. I'd like to shift focus a little bit because I'd like to take sort of a trip through the remands and how Judge Hayden has approached each time. And I'd also like to start with the government refuses to acknowledge that some of the decisions they made about charging this case and about how the jury would be instructed would make the job of Judge Hayden infinitely more difficult. And Judge Smith, you mentioned that you're not as familiar as the case as perhaps Judge McKee. The government refused to submit, did not want to submit interrogatories to the jury that would allow them to answer, to provide questions, answers about the degree of harm. Specific interrogatories during the trial, which are essentially disfavored in criminal trials. They're very, very rarely used, but occasionally there's a reason. And this is a very rare case. It was the first of its kind. It is, as far as I know, the only... It's an assimilative crimes act case. Assimilative crimes case isn't that unusual, but a child abuse case with what this Court has acknowledged is a very unclear statute, a morass, as it must have been Judge Cowan. I forget who said morass, but... Notwithstanding the judges being upset with the government or the government objecting, she could have instructed the jury that way. The defense could have asked that the jury be instructed with interrogatories. We did ask. And the judge could have charged with interrogatories. She could have, but she disrespected the government's decision, I mean, the government's choice of how to proceed because it's part of... At the end of the day, she opted not to. And it was her, at the end of the day, it's her choice as to how she's going to charge the jury, not the government's. Correct. And it's not for a judge to be criticizing, at least in the very rare case, the prosecution for how they, on a discretionary basis, exercise their charging function, so long as they have evidence to support the charges that have been filed. Respectfully, I don't think there was any criticism there. I think it was an observation, a fact, that it would make it more difficult. And it did make it more difficult. And Judge McKee, in your dissent, you noted... Excuse me. Maybe I'm misunderstanding something. I thought that at least the implication was that the government had made things more difficult for Judge Hayden by both charging decisions as well as decisions that had to do with how this case was presented to the jury. Maybe I misunderstood you. She observed that the failure to... That not submitting, not asking the jury about the degree of harm would make it more difficult to make those kinds of findings at sentencing. But ultimately, that was her decision. Well, perhaps she made the wrong one. We think she made the wrong one. But she respected the government's discretion, and she plowed ahead... Discretion to do what? Government's discretion. The government's choice to not... Government's objection to those interrogatories. But as Judge Estrepo has said, they can object all they want to. A United States district judge is one of the most powerful people in the world. They... A lot more so than the Court of Appeals judges. They're the sole decider. She could do what she wants to. Well, it ended up being as difficult as she anticipated, making those findings. She made a decision at trial, at the first sentencing, that she couldn't make those findings a fact, based on an argument that we made. She... It split again. It split... It split the court. It wasn't a frivolous argument. It was an unusual case, an unusual argument. She made what this court determined was the wrong decision. When it came back on remand, she took to heart... And if you read the second... The transcript of the second sentencing, it is very clear that she took so seriously to heart the words in Judge Cowan's opinion, that it would be difficult to connect each count to a particular incident or condition. The implication being, she was supposed to. So she did. Once again, an unusual case, an unusual decision. And I don't think she... I'm defending Judge Hayden. I think she took a difficult case and followed, did her best to follow those words. She took them seriously. There is no question that she took this case very seriously, and sincerely so. And it comes back on remand, and the parties arrive, the government arrives at sentencing, and one of the first things they say to her is, a lot of this is settled. A lot of this is taken care of. We've agreed upon the grouping structure. You only have to find one injury in a group to find aggravated assault. That is completely handled. Nonetheless... It was only the grouping that both sides decided upon, or both sides agreed to though, is that... Well, we also agreed to the calculation of two groups minus the acceptance of responsibility. Okay, thank you. But she had every reason to believe that that was how... That that was settled, how to proceed. Moreover, I want to add before I forget, nowhere in Jackson 2 did the mandate or did the court say that she was not responsible still for looking at the medical evidence. She was not supposed to ignore medical evidence. That would never happen in a case. She was not to... She was not to ignore the fact that she had to make credibility determinations, and this court never said her credibility determination, her limited credibility determination as to JJ was incorrect. It didn't opine either way. The government paints that credibility determination as a blanket denial of his credibility, but it wasn't. It was his credibility as to daily meetings, which of course, that credibility determination would impact perhaps the causation of certain injuries such as skin conditions. If you don't believe the children were beaten daily, then maybe those skin conditions were not. That could have played into... That may have played into her reasoning. That's an important credibility determination that this court did not say she was precluded from making. So the government acknowledged or represented to her that if you find a certain... In a group, that group is handled. Nevertheless, Judge Hayden went above and beyond what she was required to do for that group, the calculation of that group, and she made findings about various injuries. The government disagrees with those findings, but she made the findings nevertheless. I believe in some sense that she is being held to a standard, a guidelines plus standard in that sense. She did not have to make those findings. And I think part of the problem... And so to go to reassigning on remand, I believe her handling of the case on each remand should give this court absolute confidence that if it's remanded to her again for a procedural error, which we don't believe there is, but if it were handed to her again, she would take it seriously. What do we make of her comments? Her comments on the record that she, in essence, anticipated this coming back and she knew where she was in getting it back. What do we do with that? I think it was, I can't read her mind, but I think it may have been a moment of maybe she predicted three strikes and I'm out. Maybe it was a moment of pessimism or, I don't know, insecurity. Maybe federal judges get insecure. I do not believe she was saying, I want out or I am definitely going to be out. I do not think she was backing out of the case. I think it was just a toss-off. I do not think any more should be read into it than that. Exasperation? I'm sorry? Exasperation. I don't even think it was that, Your Honor. I mean, perhaps we've all had moments. I think I've been with this case since the beginning. I'm sure we've all had moments. But no, there is no question in my mind that Judge Hayden, if this were handed back to her, she would handle it with the same diligence, thoroughness, attempt to do the right thing that she has handled both remands. And frankly- But then what about the appearance issue? I think Judge Smith brought this up. We talked about it in our case in Kennedy. The appearance. If it were to go back to Judge Hayden, who I also have the greatest of respect for. I think she's a wonderful judge. But the appearance is saying it back to Judge Hayden as opposed to a, quote, neutral tribunal. I believe if you're- I think she has done her best to tease out every instruction that this court has given her. She would again. And I actually think that would send a very powerful message, that it isn't three strikes and you're out. It's not as the government has criticized her even for that, for using sports metaphors. I mean, on the super petty level, the criticism has been extraordinary. She- It's not three strikes and you're out. She should have the opportunity in this extremely difficult case to continue to tease through this very difficult case. And I think the message would be, Judge Hayden, I think, is extraordinarily transparent, extraordinarily willing to share her thinking on really difficult issues. For example, I think a classic example is her opinion of the variance she's given for his- for John Jackson's military service. She's explained, in part, it's not the reason for her, for the variance, but it explains that she thinks there's a disconnect between the public and the military. It was a factor, though, wasn't it? Oh, it certainly was. That she permissibly- Absolutely. Very permissibly could have considered. Absolutely. She evinced a very sincere concern for this family, for this family unit going forward. I apologize. I didn't mean that the military service wasn't the reason. I mean the rationale that there's a disconnect. I understand. But I think she was trying to explain why she thinks it's so important, his military service. And I note that, ironically, in Tomco, the government compared the defendant there to someone- well, they called him, you know, he was greedy and didn't have to do this. It's not- and they said, it's not like he's served in the military. You know, I think sort of dismissing his charitable work or something to that effect. Here, Mr. Jackson did serve in the military. And Judge Hayden, I think, correctly honored that and saw it as honorable. But my point is that she's extremely transparent. That should be encouraged. It should not be in any way discouraged. I think the law benefits from that. Her expressions of concern about judicial fact-finding. There was nothing- there's nothing wrong with a judge saying, I have real concerns about this. She put them on the record and she plowed forward. How many judges expressed reservations about the mandatory guidelines before they were not mandatory? Many. And it was really important to the evolution and the feedback of the law that there was so much expressions of concern. Same with the crack powder guideline. It should go back to her for the very reason that this is a difficult case and she is willing to struggle through. The opposite, sending it to another judge, I think sends a really unfortunate message. It certainly- she does not meet the standard. She has been of the public appearance that she's not fair. She has ruled for the government. She has ruled against the government. She has ruled for us. She has ruled against us. Even in the enhancements, they're practically split in half, who's, you know, that she's ruled for and against. I think she's a model of how to battle through a tough- well, if there's error, and I do not want to concede that there's error, and I hope, however, if the court does find procedural error, it will not remark upon the substantive reasonableness. I think if you don't find procedural error, this case is- the sentences are substantively reasonable. And I guess I'll only address that if the court wants me to. There's no reason for us to reach substantive reasonableness if we were to determine that the mandate was not adhered to and that the matter should go back, right? Correct. Is that a hint that I shouldn't bother? I wrote Tomko, so, you know, I'm interested in your answer. Okay. Well, Tomko, I think this case has enormous similarities, in a way, with Tomko. But I will just address that does the record as a whole reflect rational and meaningful consideration of the 3553A factors? I don't think there can be any dispute that Judge Hayden worked through the 3553A factors rationally and meaningfully. Are the reasons for the sentence logical and consistent with the 3553A factors? Absolutely. She took into account Judge John Jackson's work ethic, his military career, his lesser culpability, the fall she mentions that he'd taken, struggling, he'd lost his pension, had to start with manual and low-paying jobs, has thankfully rebuilt to some degree, not totally, but to some degree. He kept that family united by twice-monthly trips to the prison to see his wife, who was incarcerated twice. And I don't want it forgotten that he is serving a sentence. He was sentenced to probation originally, and second time, and is now serving, continues to serve, a sentence of home imprisonment, which the Supreme Court has said represents a significant restriction of liberties. This case should be affirmed. If it is sent back for procedural error, it should go back to Judge Hayden, and we should all continue to work through it. It should be affirmed, though, first and foremost. What about her comment, which really troubled me, is the fact that I have tremendous respect for Judge Hayden, but her comment, and I think this was at the last resentencing, about the brilliance, that if these measures had worked, there would have been brilliant parenting, something very much to that effect. That absolutely floored me, to tell you the truth. I was blown away by that. Whether or not forgetting the burdens of fact and which injuries were caused by the Jacksons and which injuries weren't, there was clearly a nucleus of conduct toward these kids that the jury found, and there's a nucleus of conduct that we had set forth at 100, page 100 of our last opinion. In context with the jury finding, we suggest that the judge should look at that in terms of whether or not there's causation established there, but whether or not there is, just to say that the tactics were brilliant, would have been brilliant parenting had they worked, just absolutely flabbergasted me. That, more than anything else, that gave me pause about whether or not, given the appearance of this under Kennedy, it should go back to Judge Hayden. May I respond? Please, yeah, please. Thank you, Judge. If it's the comment I think of, the brave comment, where she used the term brave? Brilliant. I thought she said it would have been deemed brilliant had it worked. I think we're referring to the same one, and I think that has been taken very out of context repeatedly through this case. She was referring to Carolyn Jackson's willingness to take in the children of extended family to homeschool and to handle a family of five very young children. She was saying if that had worked out, if she had been able to handle all that, she would have been called brave. Okay, I'll take another look at it. Oh, thank you. I really do think that has been taken out of context. You're right, but I'll take another look at it, because I said that before. No, she was referring, and I think that's consistent with the fact that part of her, if I can speak for Carolyn for a second, that she was speaking to Carolyn being overwhelmed at times, particularly when John was either- When I have five kids, who wouldn't be overwhelmed? Right, particularly when John was deployed and or very busy with military service. I think that's one of the comments that it gets me every time that it's mentioned. It truly was referring to her being overwhelmed. She has spoken numerous times about the massive disapproval, and that's a quote, of the parenting tactics. Thank you, Your Honors. Your Honor, I think I'll be very brief. I just want to put a couple of things on the record and respond to just one or two things. Mr. Waldman talked about the two incidents of hypernatremia, that the judge found both of those. I think our reply brief is very clear that the judge found only one, didn't even talk about the first hypernatremia at the third sentencing hearing. There was some discussion about her finding Joshua's humorous, also not true. She found that the defendants caused Joshua's humorous fracture, but by accident, not an assault. And this is what Mr. Waldman said. This is pages 85, 84 through 85 of the record, where Mr. Waldman said at the second sentencing hearing, the court found the humorous fracture in the finger, quote, were not to have been the result of an assault. So she has never found that those injuries were the result of assault. The finger she found at the third sentencing, but not the humorous. So she found only two injuries, not several. I want to just very quickly, because this came up, the birth injury issue. I referenced this picture at the sentencing hearing. It's page 6758. It's a picture of C when she was taken, when the Jacksons got her. And so the argument is that in this picture, she has a broken humorous. But when she's lying in that bed, looking like a baby at 24 months, that there she was perfectly fine, no humorous fracture there. I think that's a little ridiculous. The jury instruction issue came up. I really want to be brief on this, because I think it's really unfortunate that the government has really been punished on this, sentencing after sentencing after sentencing. It's page 5460 to 78. That's where the argument was on the jury instruction issue. And your honors are right. Obviously, it's the court's decision on how to instruct the jury. But what the issue was, and I want to be real brief about this, the defendants picked out a particular definition that's in the New Jersey statute. There's many, many ways to violate the New Jersey statute. The problem is there's a fourth-degree crime and there's a second-degree crime. New Jersey courts have said those crimes are identical. The prosecutor could pick which one based on the seriousness of the offense. And that happens in federal law, too. There's a case Batchel there. It's a Supreme Court case. The same exact thing happened. The defendants picked out one particular definition and said, we want the jury to find this one beyond a reasonable doubt or acquit. The government said, no, that's not how the statute works. We don't think you should have to charge that. But the government said, look, we think that we could prove that. So what we would like to do is you instruct like we've asked, and then you could ask a special interrogatory if you're concerned, have the jury weigh in on that particular harm. The defendants said, no, we want a lesser-included instruction. In other words, what we want is if you find that harm, it'll be a second-degree offense. If you don't find that harm, it'll be a fourth-degree offense. That was wrong. And there was no basis for the government to agree to that. The district court agreed and said it wouldn't instruct on that. But the district court then said, well, you might have trouble at sentencing. And now the court has really held the government to that at every single sentencing, saying, well, it's the government's charging decisions. That's why we're here. That's all the problem. And I just want to read page numbers. 6491, 6576, 6703, 6714. That's at the first sentencing. 8298, 8299, 8300. That's at the second sentencing. 9020 to 21, 9042, 9043, 9046, 9075. That's at the third sentencing, where the district court had said, you know what, government? You fought clarity. You made this hard on everybody. And this is why we're here. That's not true at all. And I give you an example that we could all agree with, a mail fraud case, for example. If the defendant said, Your Honor, I want you to instruct that the jury has to find $10 million in loss in order to convince, the government would rightly say, no, Your Honor, that's not an element. If the district court at that point said, you know what? You're right. We won't instruct on that. But when we get to sentencing, I won't find any loss. I think we would all agree that that would be a gross abuse of discretion at sentencing. So that's really what's going on here. And I think it's unfortunate and wrong. And finally, just on the reassignment point, Your Honor, we would ask that it go to another judge. The court didn't follow Jackson too. I think it's questionable whether she followed Jackson long. She hasn't really reexamined the case despite all of these remands. John still hasn't served a day in prison, even though his guideline range has gone way up, even though this court has said they committed several aggravated assaults. We think it's time to go back to a different judge so we can get a resolution in this case. If the court has no questions, I'll rely on my papers. Thank you very much.